## THOMPSON v. THE STATE.

1. The court did not err in admitting in evidence the testimony of a witness as to the dying declaration of the decedent, there being evidence that the decedent said, within an hour or two after making this declaration, that he was dying, and a showing also that the decedent was at that time in articulo mortis, and the character of the wound itself being of such a nature as to authorize the jury to infer therefrom that the decedent was conscious of his condition and approaching end.
2. There was some evidence to authorize the verdict; and that being true, this court will not disturb the judgment of the court below, no error of law committed pending the trial being made to appear.

　　　　　　　No. 2929. MARCH 18, 1922. .

Indictment for murder. Before Judge Fortson. Clarke superior court. November 12, 1921.

*Henry C. Tuck* and *Dorsey Davis*, for plaintiff in error.

*George M. Napier, attorney-general, W. O. Dean, solicitor-general,* and *Seward M. Smith, asst. atty.-gen.,* contra.

BECK, P. J. John Thompson was tried under an indictment charging him with the murder of D. W. Huff, by shooting the decedent with a shotgun, and the jury trying the case returned a verdict of guilty. The defendant thereupon made a motion for a new trial, which contained the usual general grounds, and the additional ground that the court erred in admitting certain testimony set forth in the motion. Upon the hearing the court overruled the motion, and the defendant excepted.

1. In the first ground of the motion error is assigned upon the ruling of the court in admitting in evidence the following testimony of a witness, one Alex. Hill: " I says, ' Uncle Doc [meaning Huff, the decedent], do you know who shot you ? ' and he says, ' Of course I do.' And I says, ' Who ? ' and he says, ' Old big John Thompson is the negro who shot me.' " This evidence was objected to on the ground that no foundation had been laid for its admission; that no proof had been submitted to show that the decedent, Huff, was in a dying condition at the time and that he realized his condition. The court did exclude this evidence upon the objection, but afterwards admitted it. There was no error in admitting the evidence when the court finally ruled upon its admissibility. The decedent was shot about 12 o'clock. The weapon was a shotgun, the entire load penetrating the bowels. The defendant died in about two hours, and subsequently to making this

statement to the witness Hill the dying man stated in the presence of two physicians and. a nurse that he was dying; and there was testimony showing that he was conscious and rational. In the light of that evidence, the court properly permitted the introduction of the testimony. Indeed, the court might have admitted the testimony when it was first offered, in view of the character of the wound. In *Young* v. *State,* 114 *Ga.* 849 (40 S. E. 1000), it was said: "It is not, in order to render dying declarations admissible in evidence upon a trial for murder, essential for the State to show that the declarant affirmatively said he was in a dying condition, or used language of like import. If he was in fact in articulo mortis and the circumstances were such as to indicate that he must have known that this was so, it is proper to allow the declarations to be proved. . ." And in the case of *Barnett* v. *State,* 136 *Ga.* 65 (70 S. E. 868), it was said: "It is not necessary that the person whose statements are sought to be introduced should express himself as believing that he is in a dying condition. Consciousness of his condition may be inferred from the nature of the wound or from other circumstances."

2. The evidence authorized the verdict of guilty; that is, it made the question of the defendant's guilt a question for the determination of the jury. The decedent was shot at about 12 o'clock at night. Shortly after the gun was fired the witnesses introduced by the defendant, one Woods and Mrs. Woods, arrived and found the dying man in a recumbent position where he fell. Woods testified, "I asked him who shot him; and he said he 'didn't know, a big black negro.' I asked him where he hit him, and he showed me. I says, 'Can't you tell who it was ?' and he said, 'No, I can not tell who it was; it was dark.' So I started in there to telephone for a doctor, and he told me not to go in there as the telephone wire was cut, and says, 'He is still in there, he has not gone out yet.' And he says, 'Go get a doctor quick,' and I run over about a half mile to get to a telephone and woke up Mr. Hill and got him to go over there and telephone for a doctor, and I run on back over there. My wife went down there with me, Mrs. Woods. She went with me over to Mr. Hill's, and we left Mr. Huff there. I got Mr. Hill, I woke him up." Upon cross-examination the same witness testified: "I told Mr. Huff [referring to the son of the decedent] just as plain as I could the

next morning just what Mr. Huff told me: ' It was a big black negro shot him;' and he couldn't tell, and I asked him who did it and he never did tell." In answer to the question "You told him a big black negro shot him, that he didn't give any name, and you didn't ask him. Didn't you tell Mr. Huff here that ?" witness answered: "I told Mr. Huff that his father told me that a big black negro shot him, and he didn't tell me'who did do it. I asked him who killed him. Mr. Huff told me it was a big black negro and he could not tell who it was."

This evidence of Woods was corroborated by the testimony of his wife. But a witness introduced by the State, Dr. H. W. Birdsong, testified: "He [Huff] died about two o'clock. He lived about an hour after I saw him. The wound was just to the left of the lower end of the sternum about an inch to the left of the lower end of the breast bone — sternum. He lived about an hour after that. The cause of his death was a gunshot wound. I made a thorough examination of the wound. I found that the left lobe of the liver was shot into. First, there was an opening through the skin about as big as a dollar, caused from a shotgun. The lobe of the liver was shot into, and also the lead went through the stomach and the large bowels, and also portions of the smaller bowels was shot and the left kidney. The upper pole of the left kidney, and also the spleen. In the wound I found some shot and a few fragments of his clothing; and after he was carried to the undertaker's parlor we went down there and opened him up, and found the wadding just at the upper pole of the kidney, wadding from a shotgun. He made a statement in my presence with reference to who did it; his condition at that time was fair. He was rational at that time. As to his condition or knowledge as to whether or not he would live, he thought he was dying. He told me before he made the statement he was dying. I asked him who shot him; and he said, the first time I understood him to say, 'Big John Thomas,' and I asked him, 'Who did you say?' and he said, 'Big John Thompson.'" In answer to the question whether or not the decedent made any other statement about where he was or anything, witness answered, "That was the only statement he made." In answer to the question, "Was anybody else present at that time ?" witness answered, "Yes, Dr. Coffee and the night superintendent, Miss Hutchins. She is the night superintendent." Dr. H. D.

Coffee also testified that he heard the decedent make a statement as to who shot him. At that time he was conscious and rational. He knew that he was dying. He said that " Big John Thompson," a negro, shot him. Dr. Coffee and Dr. Birdsong both testified as to the character of the wound.

Alex. Hill, a witness for the State, testified: " I have known 'Big John Thompson a'year or two. I never spoke to him as I know of, to recall of. As to any trouble with Mr. Huff and John Thompson prior to this — just about two weeks before he was killed, me and old man Doc [the decedent] was coming to town one Saturday evening, and old man Doc had loaned Big John five dollars, and he had been owing it three or four or five months, and old man Doc told me to stop up there, and says, ' I will ask old Big John if he has any money for me,' and we stopped and asked him, and he told him, no, he didn't have any money for him, and the old man says, ' You just aint a negro of your word, or you would have paid me when you promised,' and he says, ' God damn you, I will see you later,' and turned around and walked off. That is all he ever said to him. What John Thompson stated to old man Doc was, Thompson told old man Doc, ' God damn you, I will see you later.' This may have been two weeks before the killing, maybe a little less or maybe a little more."

Notwithstanding the testimony of Mr. Woods and his wife as to the statement made by the decedent, the jury were authorized to find that the dying man, while absolutely in articulo mortis and fully conscious of his condition, made the statement that the defendant was the man who killed him. And there was also the evidence, slight though it may be, tending to show that the accused entertained feelings of enmity towards the dead man. It is urged in the arguments of counsel for the plaintiff in error that the dying declarations made by the decedent are not to be considered as anything more than an impression made upon the mind of the declarant. In other words, that it was a mere conclusion of his, and ought not to have any weight as a conclusion stated by him, in the absence of evidence of facts upon which he based that conclusion. Manifestly, the statement was one of fact, and a fact proper to go to the jury and to have such weight with them as it was entitled to under all the circumstances. That it was a single bare fact, unaccompanied by a statement of surrounding

circumstances; that in the poor light where the shooting was done it was impossible for the wounded man to recognize his assailant; that he might have jumped to the conclusion that it was John Thompson who killed him, without actually recognizing him,— all of these suggestions in the written arguments of counsel were arguments proper to be made before a jury. But this court will not weigh nicely the evidence that is submitted. We have no right to do so. Evidence which was competent under our statutes was submitted for the consideration of the jury, and it satisfied their minds beyond a reasonable doubt of the guilt of the accused; and this court can not declare that the court below abused his· discretion in overruling the motion for a new trial based upon the ground that the evidence was not sufficient, and that the jury did not have the facts before them which would authorize a conviction.

*Judgment affirmed. All the Justices concur, except Fish, C. J., absent because of sickness.*